UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
ARROW LIGHTER, INC., a California : 
Corporation, :
 :
                              Plaintiff, :           **REPORT &**
 :           **RECOMMENDATION**
            -against- :
 :           1:19-cv-01828 (ENV) (PK)
NORTH AMERICAN CAPACITY INSURANCE :
COMPANY, a New Hampshire Insurance :
Company, :
 :
                              Defendant. :
------------------------------------------------------------- x

**Peggy Kuo, United States Magistrate Judge:**

Arrow Lighter Inc. ("Plaintiff" or "Arrow") brought this insurance coverage suit against North American Capacity Insurance Company ("Defendant" or "NAC"), seeking, as relevant here, a declaratory judgment that NAC had a duty to defend Arrow in two underlying lawsuits brought against Arrow by BIC Corporation ("BIC"): *BIC Corp. v. Arrow Lighter, Inc. et al.*, No. 1:18-CV-06922 (DLI)(PK) in the Eastern District of New York (the "Civil Action") and *In re Certain Pocket Lighters*, No. 337-TA-1142 before the United States International Trade Commission (the "ITC Action," and collectively, the "BIC Actions"). (Am. Compl., Dkt. 38; *see also* Compl., Dkt. 1.) In its Answer to Arrow's Amended Complaint, NAC asserted counterclaims, seeking, as relevant here, a declaratory judgment that it had no duty to defend the ITC Action and only a limited duty to defend the Civil Action. (Am. Answer, Dkt. 39.)

The parties have cross-moved for partial summary judgment. The Honorable Eric N. Vitaliano referred the motions to me for a report and recommendation. (*See* Orders dated July 31, 2020.) For the reasons below, I respectfully recommend that Arrow's motion be GRANTED in part and DENIED in part, and that NAC's cross-motion be GRANTED.

1

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The following facts are taken from Arrow's statement filed pursuant to Local Civil Rule 56.1 ("Arrow 56.1," Dkt. 57), NAC's Response to the Arrow 56.1 ("NAC Response 56.1," Dkt. 60), NAC's Rule 56.1 Statement ("NAC 56.1," Dkt. 66), Arrow's Response to the NAC 56.1 ("Arrow Response 56.1," Dkt. 68), and documents filed in support of those Rule 56.1 Statements.

Except where otherwise noted, there is no genuine dispute as to the facts below. Where there is a dispute, the parties' respective positions in their Rule 56.1 statements are noted.

## I.    The Policy

Arrow, a wholesaler of pocket lighters, purchased Commercial General Liability Policy No. 88-G1000135-00 (the "Policy," Ex. 1 to the Declaration of Xiao Mei Su dated April 1, 2020 ("Su Decl.") at ECF Pages 7−52, Dkt. 55) from NAC for a policy period of August 1, 2014 to August 1, 2015, and renewed it for an additional year from August 1, 2015 through August 1, 2016.[1]  (Arrow 56.1 ¶ 1; NAC Response 56.1 ¶ 1.)  For purposes of this discussion, the "Policy Period" is August 1, 2014 through August 1, 2016.

The Policy covers "damages because of 'personal and advertising injury' to which this insurance applies," and imposes on NAC a "duty to defend [Arrow] against any 'suit' seeking those damages."  (Policy § I.B.1.a at ECF Page 42.)  "Personal and advertising injury" is defined as "injury, including consequential 'bodily injury,' arising out of one or more of the following offenses: … [t]he use of another's advertising idea in [Arrow's] 'advertisement'; or … [i]nfringing upon another's copyright, trade dress or slogan in [Arrow's] 'advertisement.'"  (*Id.* § V.14 at ECF Page 50.)  "Suit" is defined as "a civil proceeding in which damages because of 'bodily injury', 'property damage' or 'personal and advertising injury' to which this insurance applies are alleged," and also includes

---

[1] NAC contends that there were two policies (NAC 56.1 ¶ 1), but there is no material difference between them. Accordingly, I use Arrow's characterization of a single policy.

arbitration proceedings and other alternative dispute resolution proceedings "in which such damages are claimed." (*Id.* § V.18 at ECF Page 51.)

The Policy contains exclusions for "Knowing Violation of Rights of Another" and "Material Published Prior to Policy Period." (*Id.* § I.B.2 at ECF Page 42.)

Arrow paid all premiums due under the Policy. (Su Decl. ¶ 5; Arrow 56.1 ¶ 3; *see also* NAC Response 56.1 ¶ 3.)

## II.   **The Civil Action**

On December 5, 2018, BIC filed a complaint in the Civil Action (the "Civil Complaint") against Arrow (d/b/a MK Lighter Inc. and MK Lighter Company), Excel Wholesale Distributors Inc. ("Excel"), and Milan Import Export Company, LLC ("Milan"). (*See* Civil Compl., Ex. 2 to Su Decl. at ECF Pages 53–105.) The Civil Complaint asserts that "[f]or over 45 years, and well before the acts of [d]efendants identified herein, BIC has used distinctive source-identifying product configurations—collectively referred to hereinafter as the 'Trade Dress'—to indicate the origin of its pocket lighters." (*Id.* ¶ 19.) BIC alleged that Arrow and its co-defendants infringed BIC's trade dress in that "at least over 40 years after BIC began using its famous and distinctive Trade Dress, [d]efendants began importing, distributing, advertising, marketing, offering for sale, and/or selling in the United States lighters that incorporate BIC's Trade Dress in a blatant, willful, and knowing attempt to trade off the goodwill that BIC has developed." (*Id.* ¶ 33.) BIC identified two of Arrow's models of pocket lighters as infringing its trade dress—Arrow's  "Grip Series" and its "Mini-Grip Series." (*Id.* ¶¶ 34–35.) BIC further alleged that Arrow was "marketing and intends to sell another, even more blatant knock-off incorporating BIC's Trade Dress"—the "Dura-Lite Series." (*Id.* ¶ 36.)

Exhibit 3 to the Civil Complaint includes a timeline of the manufacturing growth at Arrow, which indicates that the MK Lighter Brand was launched in 2005, that 700 million lighters were

produced annually by 2014, and that the "MKgrip & MKjet lineup" were "[i]ntroduced" in 2017. ("MK Timeline," Ex. 3 to Civil Compl. at ECF Page 96.)

BIC sought injunctive and other non-monetary relief against Arrow, along with damages, fees, costs, disbursements, and interest. (Civil Compl. at ECF Pages 23–25.)

On May 13, 2019, Arrow moved to stay the Civil Action pending resolution of the ITC Action, discussed below. (Declaration of Charles C.H. Wu dated April 2, 2020 ("Wu Decl.") ¶ 15, Dkt. 54; Arrow 56.1 ¶ 20; *see also* NAC Response 56.1 ¶ 20.) *See BIC Corp. v. Arrow Lighter, Inc.*, No. 18-CV-6922, Dkt. 26. The Court denied the motion, but administratively closed the Civil Action without prejudice to reopening the matter within 30 days of the conclusion of the ITC Action. (Ex. 21 to Wu Decl. at ECF Page 14; NAC Response 56.1 ¶ 20.) *BIC Corp. v. Arrow Lighter, Inc.*, No. 18-CV-6922, Order dated July 15, 2019.

## III.    **The ITC Action**

On December 6, 2018, BIC filed a complaint in the ITC Action (the "ITC Complaint") against Arrow and other entities alleging that those entities were importing lighters infringing BIC's trade dress. (*See* "ITC Compl.," Ex. 3 to Su Decl. at ECF Pages 109–267.)

In the ITC Complaint, BIC alleged that Arrow imported and sold infringing lighters in the United States in violation of 19 U.S.C. § 1337. (*Id.* ¶¶ 25, 47.) The ITC Complaint identified Arrow's allegedly infringing lighters as the MK "Grip Series" (*id.* ¶ 69) and the MK "Mini-Grip Series." (*Id.* ¶ 70.) The ITC Complaint also alleged that Arrow was marketing and intending to sell the "even more blatant knock-off" … "MK dura-lite Series." (*Id.* ¶ 71.) Exhibits attached to the ITC Complaint included an invoice for a "ZY-7G-MK-GRIP" lighter (*id.* at ECF Page 189) and webpage screenshots of the "ZY-7G" and "ZY-8G" lighters. (*Id.* at ECF Pages 209, 212–13.)

BIC requested that the International Trade Commission: immediately investigate the alleged violations; issue a general exclusion order forbidding entry into the United States any pocket lighters

infringing BIC's trade dress or, alternatively, a permanent limited exclusion order against Arrow's alleged infringing lighters and a permanent cease and desist order against Arrow; require Arrow to post a bond to protect BIC from injury during the review period; and grant other relief as the Commission deemed just and proper. (*Id.* at ECF Pages 140–41.)

## IV. Arrow's Request for Defense and Initiation of This Lawsuit

Arrow tendered both BIC Actions to NAC for defense and indemnification on January 7, 2019. ("Jan. 7, 2019 Tender," Ex. 12 to Su Decl. at ECF Pages 315–16; *see also* NAC 56.1 ¶ 3; Arrow Response 56.1 ¶ 3.) Between January 7, 2019 and February 13, 2019, NAC and Arrow exchanged communications in which NAC requested, and Arrow provided, additional information about the BIC Actions and Arrow's other potential insurers. (NAC 56.1 ¶¶ 3–6.) NAC did not agree or refuse to provide coverage to Arrow in those communications. (Arrow 56.1 ¶ 24.)

Arrow filed the Complaint in this case on March 29, 2019, alleging that NAC had a duty to defend Arrow in the BIC Actions, and that NAC had breached its contract and its duty of good faith and fair dealing by failing to provide and pay for Arrow's defense. (Compl. ¶¶ 24–31.) In its Answer of May 8, 2019, NAC interposed several affirmative defenses, arguing that the Civil Action is subject to Policy exclusions for "Knowing Violation of Rights of Another" and "Material Published Prior to Policy Period," and that the ITC Action does not seek "damages" resulting from "personal and advertising injury." (Answer at ECF Pages 6–7, Dkt. 13; Arrow 56.1 ¶¶ 32–34; NAC Response 56.1 ¶¶ 32–34.)

Between May 9, 2019 and May 23, 2019, NAC and Arrow exchanged further communications regarding Arrow's supporting documentation for its claim to coverage. (NAC 56.1 ¶¶ 8, 13–14; Arrow Response 56.1 ¶¶ 8, 13–14.) Arrow then filed a first Motion for Partial Summary Judgment on May

24, 2019.[2]  (Dkt. 16.)  In its memorandum in support, Arrow explained that BIC had identified the allegedly infringing lighters as the Grip Series, Mini-Grip Series, and Dura-Lite Series, and these products corresponded to Arrow's ZY-7G, ZY-8G, and ZY-30E products respectively.  (Dkt. 16-1.) Arrow stated these products "were first designed, manufactured, advertised, and sold within (and not before) the [NAC] policy period…"  (Id.)  Arrow's supporting declaration reiterated that the infringing lighters were the "Grip Series" product (ZY-7G), the "Mini-Grip Series" product (ZY-8G), and the "Dura-Lite Series" product (ZY-30E).  (Dkt. 16-3 ¶ 11.)  Attached to the declaration was documentation showing that the first sale of ZY-7G lighters in the United States occurred in 2015 (2015 Invoice, Dkt. 16-12), and that the ZY-7G and ZY-8G lighters were advertised for the first time in 2015.  (2015 Catalogue, Dkt. 16-13.)

On May 29, 2019, NAC sent a letter to Arrow denying coverage for both BIC Actions, reiterating the affirmative defenses stated in its Answer.  ("NAC Denial Letter," Ex. 14 to Su Decl. at ECF Pages 321–33.)  Citing the MK Timeline, the letter asserted that because BIC's claims "concern Arrow's launch of its allegedly infringing MK Grip Series of disposable pocket lighters in 2017, coupled with its more recent efforts to market and sell a 'more blatant' knock off product line …," Arrow's "offenses" took place outside "the effective dates of the Policies."  (Id. at 322–323, 331.)

Arrow responded on May 31, 2019, pointing out, *inter alia*, that "the first production of any *advertising or notice* about the products accused of infringing BIC's trade dress occurred within [the Policy] period."  (Ex. 15 to the Declaration of James A. Lowe dated April 6, 2020 ("Lowe Decl.") at 2, Dkt. 78 (emphasis added).)  Arrow sent follow-up letters on June 21 and July 12, 2019, attaching and referencing interrogatory responses in which BIC identified "ZY-7G" and "ZY-8G" as the allegedly infringing Arrow products.  (Ex. 16 to Lowe Decl. at 4, Dkt. 79; Ex. A to Dkt. 79 at ECF

---

[2] After the case was reassigned from the Honorable Jack B. Weinstein to the Honorable Eric N. Vitaliano on June 10, 2019, this motion was terminated by the Court for non-compliance with Judge Vitaliano's individual rules.  (Orders dated June 10, 2019 and June 11, 2019.)

Page 16.)  On July 12, 2019, Arrow filed a second Motion for Partial Summary Judgment in this action.[3]  (Dkt. 30.)  Arrow attached to the motion the same BIC discovery response which it had sent NAC with its June 21, 2019 letter.  (Dkt. 30-19.)

In a letter dated July 19, 2019, NAC finally acknowledged a duty to defend the Civil Action. ("NAC Duty to Defend Letter," Ex. 18 to Wu Decl. at ECF Pages 9–13.)  However, NAC asserted that its duty to defend only arose on June 21, 2019, the date it received BIC's "First Supplemental Response to [Arrow's] Interrogatory No. 2," "identif[ying] the following as the accused Arrow products:  the Grip Series (ZY-7G aka ZY-7G MK Grip); the Mini Grip Series (ZY-8G aka ZY-8G MK Mini); and the MK Dura (ZY-30E)."  (NAC Duty to Defend Letter at 3; Ex. A to Dkt. 79 at ECF Page 16.)

NAC continued to deny any coverage for the ITC Action.  (NAC Duty to Defend Letter at 3–4.)

## V.    Resolution of the BIC Actions

Through mediation, BIC and Arrow reached an agreement to settle both BIC Actions which "required certain modifications of a pocket lighter to be sold by Arrow and a payment of damages to BIC."  (Arrow 56.1 ¶ 65; NAC Response 56.1 ¶ 65.)   The ITC Action was terminated as to Arrow on October 30, 2019.  (Ex. 23 to Wu Decl. at ECF Pages 16–19.)  BIC and Arrow stipulated to dismissal of the Civil Action on December 11, 2019, and it was terminated, with prejudice, on December 17, 2019.  (Ex. 22 to Wu Decl. at ECF Page 15.)  *BIC Corp. v. Arrow Lighter, Inc.*, No. 18-CV-6922, Dkts. 32, 33.

---

[3] This motion was terminated by the Court on July 15, 2019 for non-compliance with Judge Vitaliano's individual rules.

## FURTHER PROCEDURAL HISTORY

Arrow filed the Amended Complaint on January 20, 2020, seeking a declaratory judgment that NAC had a duty to (1) defend the Civil Action and the ITC Action from the date the defense was tendered to NAC, (2) pay all reasonable and necessary defense expenses, and (3) settle the BIC Actions and pay the reasonable settlement amount for those cases. It also seeks damages for breach of contract and for breach of the covenant of good faith and fair dealing. (Am. Compl. ¶¶ 80, 89, 105.)

NAC filed its Answer to the Amended Complaint on February 11, 2020. In addition to denials and affirmative defenses, NAC asserted three counterclaims seeking declaratory relief: that NAC had no duty to defend or indemnify Arrow in the ITC Action, that NAC had only a limited duty to indemnify Arrow in the Civil Action, and that NAC is entitled to reimbursement of the money it paid for the settlement of the Civil Action. (Am. Answer at ECF Pages 16, 34–37.) Plaintiff filed an Answer to the Counterclaims on March 2, 2020. (Dkt. 40.)

On March 6, 2020, Arrow filed a request for a pre-motion conference on an anticipated Motion for Partial Summary Judgment (Dkt. 41), which NAC partially opposed. (Dkt. 42.) The Court found that a pre-motion conference was not necessary and granted Arrow leave to file a partial summary judgment motion "limited to the following issues which can be resolved without the need for discovery: (a) Arrow's asserted entitlement to defense coverage for the ITC Action; and (b) the effective start date of NAC's defense obligation concerning the Civil Action." (Order dated March 13, 2020.)

On April 27, 2020, NAC requested a pre-motion conference on an anticipated cross-motion for partial summary judgment seeking an entry of declaratory relief "upholding its right to deny defense coverage for the ITC Action." (Dkt. 48 at 2.) The Court again found a pre-motion conference unnecessary and granted NAC leave to file its proposed cross-motion. (Order dated June 15, 2020.)

On July 31, 2020, Arrow filed its fully briefed Motion for Partial Summary Judgment (Notice of Motion, "Motion," Dkt. 52; "Arrow Mem.," Dkt. 53; "NAC Opp.," Dkt. 58; "Arrow Reply," Dkt. 61), and NAC filed its fully briefed Cross-Motion for Partial Summary Judgment (Notice of Cross-Motion, "Cross-Motion," Dkt. 62; "NAC Mem.," Dkt. 63; "Arrow Opp.," Dkt. 67; "NAC Reply," Dkt. 69). Both motions were referred to me for a report and recommendation. (Orders dated July 31, 2020.)

On December 2, 2020, Arrow filed a Notice of Supplemental Authority (Dkt. 72), to which NAC responded on December 17, 2020. (Dkt. 75.) Arrow filed a second Notice of Supplemental Authority on March 30, 2021 (Dkt. 76), to which NAC responded on April 6, 2021. (Dkt. 77.) Arrow filed copies of missing exhibits on August 17, 2021. (Dkts. 78–81.) Arrow filed a third Notice of Supplemental Authority on October 12, 2021 (Dkt. 82), to which NAC responded on October 19, 2021 (Dkt. 83); Arrow filed a reply on October 26, 2021. (Dkt. 84.)

## SUMMARY OF THE PARTIES' ARGUMENTS

### I.  Arrow's Motion for Partial Summary Judgment

Arrow's Motion seeks summary judgment declaring that (1) NAC had a duty to defend Arrow in both the Civil Action and ITC Action, (2) this duty arose on January 7, 2019, when Arrow tendered the two actions to NAC; and (3) NAC breached its duty to defend by failing to pay Arrow's defense expenses.[4] (*See* Arrow Mem. at 3, 37.)

Because the Court only granted Arrow leave to file a partial summary judgment motion "limited to … Arrow's asserted entitlement to defense coverage for the ITC Action; and the effective start date of NAC's defense obligation concerning the Civil Action" (Order dated March 13, 2020), I

---

[4] As of March 2020, NAC had paid approximately five percent of Arrow's total defense fees. (Arrow 56.1 ¶ 68; NAC 56.1 ¶ 58.)

do not consider whether NAC's partial payment of Arrow's defense fees constitutes a breach of contract.

## II.     NAC's Cross-Motion for Partial Summary Judgment

NAC's Cross-Motion seeks summary judgment granting NAC declaratory relief that it (1) was entitled to deny defense coverage for the ITC Action and, as such, (2) is not obligated to pay any legal fees and costs incurred by Arrow in defending the ITC Action.  (*See* NAC Mem. at 1, 37.)

## STANDARDS OF REVIEW

## I.     Whether Declaratory Relief is Appropriate

A declaratory judgment is available in federal court "to resolve a 'real question of conflicting legal interests.'"  *Associated Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 35 (2d Cir. 1992) (citations omitted).  The Declaratory Judgment Act requires that there be a "case of actual controversy" in order for a court to declare legal rights and other legal relations.  28 U.S.C. § 2201(a).  "'A justiciable controversy' may not be 'hypothetical or abstract' in nature, but rather must be 'a real and substantial controversy…'"  *FSP, Inc. v. Societe Generale*, No. 02-CV-4786 (GBD), 2003 WL 124515, at *4–5 (S.D.N.Y. Jan. 14, 2003), *aff'd and remanded*, 350 F.3d 27 (2d Cir. 2003), *adhered to on reconsideration*, 2005 WL 475986 (S.D.N.Y. Feb. 28, 2005).

A request for declaratory relief that seeks determination of insurance coverage for an underlying lawsuit that has resolved is not premature and is appropriate for declaratory relief.  *See, e.g.*, *Starr Indem. & Liab. Co. v. Excelsior Ins. Co.*, No. 19-CV-3747 (KPF), 2021 WL 326209, at *9 (S.D.N.Y. Feb. 1, 2021) ("where the Third-Party Action proceeded to a trial that resulted in a jury's determination as to negligence, a declaratory judgment as to indemnification is not premature"); *cf. U.S. Specialty Ins. Co. v. Nationwide Mut. Ins. Co.*, No. 19-CV-7884 (MKV), 2020 WL 2489078, at *2 (S.D.N.Y. May 14, 2020) ("Indeed, courts in this circuit commonly find insurance coverage disputes ripe for adjudication

before the insured has incurred any liability") (citing *Stoncor Grp., Inc. v. Peerless Ins. Co.*, 322 F. Supp. 3d 505, 511–12 (S.D.N.Y. 2018)).

Because the requests for declaratory relief here arise from resolved claims in the underlying BIC Actions, determination of the parties' respective declaratory judgment claims is appropriate.

## II.    Motions for Summary Judgment

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Rule 56(a) states:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).  "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "dispute about a material fact is 'genuine,' … if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The same standard applies on a cross-motion for summary judgment, *Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001), but "a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).  Instead, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales*, 249 F.3d at 121.

III.    **General Principles of Insurance Contract Interpretation**

"In determining a dispute over insurance coverage, [New York courts] first look to the language of the policy" and "construe the policy in a way that 'affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect.'" *Consolidated Edison Co. of N.Y. v. Allstate Ins. Co.*, 774 N.E.2d 687, 693 (N.Y. 2002). "In New York, the terms of an insurance policy have long been accorded 'a natural and reasonable meaning' … corresponding to 'the reasonable expectation and purpose of the ordinary business[person].'" *Avondale Indus., Inc. v. Travelers Indem. Co.*, 887 F.2d 1200, 1206–07 (2d Cir. 1989).

"Where the provisions of the policy 'are clear and unambiguous, they must be given their plain and ordinary meaning ….'" *U.S. Fid. & Guar. Co. v. Annunziata*, 492 N.E.2d 1206, 1207 (N.Y. 1986). "It is well settled that '[a] contract is unambiguous if the language it uses has "a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion."'" *White v. Cont'l Cas. Co.*, 878 N.E.2d 1019, 1021 (N.Y. 2007). "Moreover, an ambiguity does not arise from an undefined term in a policy merely because the parties dispute the meaning of that term." *Hansard v. Fed. Ins. Co.*, 46 N.Y.S.3d 163, 167 (N.Y. App. Div. 2017) (citing *Mount Vernon Fire Ins. Co. v. Creative Hous.*, 668 N.E.2d 404, 406 (N.Y. 1996)). "If the terms of a policy are ambiguous, however, any ambiguity must be construed in favor of the insured and against the insurer." *White*, 878 N.E.2d at 1021.

IV.    **The Duty to Defend Under New York Insurance Law**

An insurer's duty to defend its insured is "exceedingly broad" and is triggered "whenever the allegations in a complaint against the insured fall within the scope of the risks undertaken by the insurer, regardless of how false or groundless those allegations might be." *High Point Design, LLC v. LM Ins. Corp.*, 911 F.3d 89, 94–95 (2d Cir. 2018). "If any of the claims against the insured arguably arise from the covered events, the insurer is required to defend the entire action." *Id.* "[T]here is no

relevant difference between the allegations that trigger an insurer's duty to defend and the allegations that trigger an insurer's obligation to pay defense expenses." *Lowy v. Travelers Prop. & Cas. Co.*, No. 99-CV-2727 (MBM), 2000 WL 526702, at *2 n.1 (S.D.N.Y. May 2, 2000).

In determining whether there is a duty to defend, a court must not "mechanically apply[ ] the 'four corners of the complaint' rule" by looking only at what is contained in the complaint of the underlying action. *Fitzpatrick v. Am. Honda Motor Co.*, 575 N.E.2d 90, 93 (N.Y. 1991). "[A]n insured's right to a defense should not depend solely on the allegations a third party chooses to put in the complaint" since the drafter of the complaint may not know, or have reason to address, the nuances that could affect the insured's coverage. *Id.* at 94.

An insurer "may deny its insured a defense 'only if it could be concluded as a matter of law that there is no possible factual or legal basis on which the insurer might eventually be held to be obligated to indemnify the insured under any provision of the insurance policy.'" *High Point Design*, 911 F.3d at 94–95 (quoting *Servidone Constr. Corp. v. Sec. Ins. Co. of Hartford*, 477 N.E.2d 441, 444 (N.Y. 1985). "[A]n insurer seeking to avoid its duty to defend bears a heavy burden. That burden, in practice, is seldom met." *City of Johnstown, N.Y. v. Bankers Standard Ins. Co.*, 877 F.2d 1146, 1149 (2d Cir. 1989) (citing *Technicon Elecs. Corp. v. Am. Home Assur. Co.*, 533 N.Y.S.2d 91, 104 (N.Y. App. Div. 1988), *aff'd*, 542 N.E.2d 1048 (N.Y. 1989)).

## DISCUSSION

## I.  When NAC's Duty to Defend the Civil Action Arose

NAC acknowledges that it must pay for Arrow's defense costs in the Civil Action but argues that its duty to defend did not arise as of January 7, 2019 when Arrow tendered the BIC Actions to NAC for defense and indemnification, but on June 21, 2019, when Arrow finally provided "its first supporting information" that the Civil Complaint encompassed models of lighters that potentially

brought the allegations within the Policy Period.  (*See* NAC Opp. at 23–24; NAC Duty to Defend Letter at 3–4.)

In support of its position, NAC contends that because the Civil Complaint did not include any specific references to the timeframe of Arrow's infringing activities, "it was entirely appropriate for NAC to take into consideration the timeline BIC attached as Exhibit 3 to its complaint, which provided a 2017 date for the introduction of Arrow's infringing MK Grip brand of lighters."  (NAC Opp. at 21.)  Because actions taken in 2017 are outside the Policy Period, NAC maintains that it "acted well within its rights when it denied coverage" for the BIC Actions in its May 29, 2019 coverage disclaimer.  (*Id.* at 23.)

I find that NAC fails to establish that the Civil Complaint raised no possible factual or legal basis which may have triggered its duty to defend the Civil Action.

The Civil Complaint, filed on December 5, 2018, does make reference to a timeframe, stating that BIC had used its Trade Dress "[f]or over 45 years"—that is, since approximately December 1973.  (Civil Compl. ¶ 19.)  It also alleges that "at least over 40 years after BIC began using its famous and distinctive Trade Dress, [d]efendants began … advertising … in the United States lighters that incorporate BIC's Trade Dress …."  (Civil Compl. ¶ 33.)  Based on these dates, the alleged infringing activities would have begun sometime after December 2013, potentially falling within the Policy Period of August 1, 2014 through August 1, 2016.  Thus, the timeframe set forth by the allegations in the Civil Complaint raised a sufficient possibility of coverage to trigger NAC's duty to defend the Civil Action.

Moreover, although the MK Timeline states that the allegedly infringing "MKgrip" series was "introduced" in 2017, this does not foreclose the occurrence of allegedly infringing advertising and marketing activity occurring earlier, between August 1, 2014 and August 1, 2016.  It is not a "strained, implausible reading of the complaint," *Century 21, Inc. v. Diamond State Ins. Co.*, 442 F.3d 79, 82–83 (2d

Cir. 2006) (quoting *Northville Indus Corp. v. Nat'l Union Fire Ins. Co.*, 679 N.E.2d 1044, 1049 (N.Y. 1997)), to interpret the MK Timeline as meaning that although sales began in 2017, advertising activities occurred in 2016 or earlier, which would potentially place them within the Policy Period.

The declaration, 2015 Invoice, and 2015 Catalogue filed on May 24, 2019, in support of Arrow's first Motion for Partial Summary Judgment (Dkt. 16), confirmed that the "Grip Series" and "Mini-Grip Series" referenced in the Civil Complaint corresponded to Arrow's ZY-7G and ZY-8G product lines—and that Arrow sold ZY-7G lighters and advertised both ZY-7G and ZY-8G lighters in 2015. This information situated Arrow's allegedly infringing activities firmly within the Policy Period and should have disabused NAC of any belief that the Civil Complaint presented no possibility of coverage.

NAC contends, nevertheless, that the connection between the Grip Series and ZY-7G lighters, and the Mini-Grip Series and ZY-8G lighters, was only conclusively established on June 21, 2019, when it received a copy of BIC's responses to Arrow's interrogatories. It, therefore, chooses that as the effective start date of its defense obligation concerning the Civil Action.

Notwithstanding that an insurer delays agreeing to provide coverage until it is convinced that its duty to defend has been established, once it concludes that coverage is warranted, it cannot limit coverage to begin only at the moment it reached that conclusion; rather, it must pay even those defense costs incurred before then. "Implicit in the duty to defend … is the duty to respond to a complaint against an insured on a timely basis. To allow an insurer to dictate the date when the duty to defend commences would defeat, to a large degree, the purpose of the duty to defend." *Smart Style Indus. v. Pa. Gen. Ins. Co.*, 930 F. Supp. 159, 164 (S.D.N.Y. 1996). Just as "an insured's right to a defense should not depend solely on the allegations a third party chooses to put in the complaint," *Fitzpatrick*, 575 N.E.2d at 94, the start date of that right should not depend on when a third party happens to put forward extrinsic evidence that provides clarity to an insurer. Here, BIC's interrogatory response may

have provided NAC with the confirmation it was seeking that the Civil Action involved infringing products advertised and marketed within the Policy Period, but the possibility for coverage, however remote, was present in the Civil Complaint itself. Construing the Civil Complaint liberally, it cannot be concluded as a matter of law that there is "no possible factual or legal basis" on which coverage may be required under the Policy. *Century 21*, 442 F.3d at 82 (quoting *Servidone*, 477 N.E.2d at 444); *see also Euchner-USA, Inc. v. Hartford Cas. Ins. Co.*, 754 F.3d 136, 141 (2d Cir. 2014) ("Any doubt as to whether the allegations state a claim within the coverage of the policy must be resolved in favor of the insured and against the carrier") (quoting *Brook Shopping Ctr. v. Liberty Mut. Ins. Co.*, 439 N.Y.S.2d 10, 12 (N.Y. App. Div. 1981)). The information NAC received on June 21, 2019 confirmed what was already in the Civil Complaint and did not constitute a different claim that newly triggered NAC's duty to defend.

Accordingly, I find that the effective start date of NAC's defense obligation to Arrow concerning the Civil Action was January 7, 2019, the date NAC received notice of the Civil Complaint from Arrow. *See Franco Belli Plumbing & Heating*, 2012 WL 2830247, at *5 ("The duty arises when the insurer has notice of the existence of the underlying complaint"); *Smart Style*, 930 F. Supp. at 164 (once notified of a claim, an insurer is placed "in a position to control or influence the litigation" and becomes "obligated at that point to provide a defense").

## II.    Whether NAC Had a Duty to Defend the ITC Action

Pursuant to the Policy, in order to establish NAC's liability to Arrow for the ITC Action, Arrow must show that the ITC Action was a "suit" that sought "damages" for a "personal and advertising injury" within the coverage territory during the Policy Period. (Policy § I.B.1.a, b at ECF Page 42.) NAC contends that it had no duty to defend the ITC Action because it was not a suit that alleged "damages." (*See* NAC Opp. at 12–20; NAC Mem. at 20–29.) Specifically, NAC maintains that the prospective injunctive relief, bond, and "other and further relief" sought by BIC in the ITC Action

do not constitute monetary damages.  (*See* NAC Opp. at 12–13; NAC Mem. of Law at 20–29; NAC Reply at 9–12.)  Arrow counters that the ITC Action does seek "damages" because (1) complying with an ITC "exclusion order would require Arrow to spend money for the benefit of BIC"; (2) NAC requested "such other and further relief as the Commission deems just and proper," which could result in an award of attorney's fees; and (3) NAC requested an order for Arrow to post a bond, *i.e.*, to put up money.  (*See* Arrow Mem. at 17–18, 27–30; Arrow Opp. at 17–18.)

A.  **Whether the ITC Action Alleged "Damages"**

Because the Policy does not define "damages," the term must be given a "natural and reasonable meaning" that corresponds to "the reasonable expectation and purpose of the ordinary business[person]."  *See Avondale*, 887 F.2d at 1206–07.  Any ambiguity in coverage terms must be resolved in Arrow's favor.  *See White*, 9 N.Y.3d at 267.

The Policy requires that damages must be causally connected to a covered injury—here, a personal and advertising injury.  (*See* Policy § I.B.1.a at ECF Page 42 ("We will pay those sums that the insured becomes legally obligated to pay as damages *because of* 'personal and advertising injury' to which this insurance applies") (emphasis added).  Damages is commonly defined as money paid as compensation for loss or injury.  *See* DAMAGES, Black's Law Dictionary (11th ed. 2019) ("[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury"); DAMAGES, Dictionary.com, https://www.dictionary.com/browse/damages (last accessed January 2, 2024) ("law money to be paid as compensation to a person for injury, loss, etc").  These definitions,[5] considered together with the Policy's language, support the conclusion that under the Policy, "damages" reasonably means payment of money by Arrow to BIC as compensation for a covered injury—not the expenditure of money by Arrow to achieve compliance with a non-monetary order.

---

[5] Arrow contends that the www.dictionary.com definition of damages is "the estimated money equivalent for detriment or injury sustained" (Arrow Mem. at 17), but I have not found such a definition on that website or elsewhere.

17

The New York Court of Appeals has declined to address whether the relief available in an ITC proceeding could constitute damages and therefore bring the action within the duty to defend. *See A. Meyers & Sons Corp. v. Zurich Am. Ins. Grp.*, 74 N.Y.2d 298, 304 (N.Y. 1989) (finding ITC complaint not a claim for "advertising injury" and, therefore, that it was not necessary to rule on whether ITC action sought "damages"). The parties have not presented, and this Court has not found, any case applying New York law which addresses whether the relief sought in an ITC action could constitute damages under insurance policy language comparable to the Policy here.

However, at least one other court, in a jurisdiction with a similar duty-to-defend standard, held that an ITC action was not covered under similar policy language because the ITC cannot award monetary damages. In a case involving a policy that provided coverage only for suits seeking 'damages' for 'personal and advertising injury,' the Court of Appeals of Washington found no duty to defend because ITC "does not have authority to order monetary damages under § 1337," which "provides for injunctive relief only in the form of exclusion and/or cease and desist orders." *Australia Unlimited, Inc. v. Hartford Cas. Ins. Co.*, 147 Wash. App. 758, 779 (Wash. 2008). This analysis is in line with the distinction that courts have drawn between relief traditionally available at law (*i.e.*, money damages) and at equity (*e.g.*, injunctive relief). *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993) (an injunction is "a remedy traditionally viewed as 'equitable'"; "compensatory … [m]oney damages are, of course, the classic form of *legal* relief" (emphasis in original).

The ITC Complaint's request for "such other and further relief as the Commission deems just and proper" also cannot create coverage, because the ITC is precluded by statute from any award of traditional monetary damages. *See* 19 U.S.C. § 1337 (d)-(f) (authorizing ITC to issue exclusion orders and cease and desist orders); *see also Suprema, Inc. v. Int'l Trade Comm'n*, 796 F.3d 1338, 1345 (Fed. Cir. 2015) (under § 1337, "proof of quantifiable harm is not an element of liability, and monetary damages are not available as relief"); *U.S. Int'l Trade Comm'n v. Jaffe*, 433 B.R. 538, 542 (E.D. Va. 2010)

("Neither § 1337 nor its implementing federal regulations permit an award of monetary damages to complainants"). The cases cited by Arrow involve situations where an award of damages was *possible*, and are, therefore, inapposite. *See, e.g., Doyle v. Allstate Ins. Co.*, 1 N.Y.2d 439 (N.Y. 1956) (finding duty to defend where suit sought only equitable relief, but court could have ordered payment of money); *Scottsdale Ins. Co. v. RSR Mgmt. Co.*, No. 00-CV-1793, 2000 WL 1456954, at *1 (E.D.N.Y. Sept. 26, 2000) ("An insurer has a duty to defend its insured in a suit seeking equitable relief, if there is a possibility of a damage award") (citing *Energex Sys. Corp. v. Fireman's Fund Ins. Co.*, No. 96-CV-5993 (JSM), 1997 WL 358007, at *1 (S.D.N.Y. June 25, 1997)); *Avondale*, 887 F.2d at 1200 (state agency's order to remediate environmental harm to third parties could have alternatively resulted in an award of damages and, therefore, could constitute damages under similar policy language).

Arrow's argument that BIC could have requested, and the ITC could have awarded, attorneys' fees fares no better. The ITC may award attorney's fees only for abusive practices or noncooperation by a party in the course of an ITC investigation, not for substantive violations. *See* 19 C.F.R. § 210.25 (providing for sanctions in limited circumstances); 19 C.F.R. § 210.33(c) ("sanctions for failure to make or cooperate in discovery"); 19 C.F.R. § 210.4(d) (sanctions for bringing frivolous, improper, or unsupportable allegations to the ITC); 19 C.F.R. § 201.21(c)(9) (sanctions to pay for the ITC's time in responding to document demands). Thus, any attorneys' fees that the ITC could have awarded would not have constituted compensation for a personal and advertising injury.

Finally, the ITC's authority to impose a bond requirement does not constitute damages under the Policy, because any bond would not be paid as compensation for a personal and advertising injury. As one court described it:

> the purpose of the bond is not to compensate the complainant for the respondent's prior unlawful importation of infringing products. Instead, the Federal Circuit has recognized that "the purpose of the bond is to protect the complainant [during the period in which a respondent's allegedly unlawful importation may continue pending a final ITC determination] as well as the public interest."

*Jaffe*, 433 B.R. at 546–47 (alteration in original) (quoting *Biocraft Labs., Inc. v. U.S. Int'l Trade Comm'n*, 947 F.2d 483, 487 (Fed. Cir. 1991)).

Because the ITC could not have awarded monetary damages as compensation for or "because of" a personal and advertising injury, the ITC Complaint did not seek "damages" under the Policy and, therefore, the ITC Action is not covered by the Policy.

**B. Whether the ITC Action was "Conducted Against Liability" Posed by the Civil Action; Whether the BIC Actions were "Inextricably Intertwined"; Whether Preclusion Creates a Duty to Defend in the Absence of Coverage**

Arrow alternatively argues that even if the Policy did not impose on NAC a duty to defend the ITC Action, NAC was nevertheless required to defend the ITC Action either because the defense of the ITC Action was "conducted against the liability" at issue in the Civil Action or because the underlying claims in both actions were "inextricably intertwined." (Arrow Mem. at 31–35; Arrow Opp. at 21.) Arrow argues that, because both BIC Actions presented the same core legal issue of trade dress infringement, defending the ITC Action was reasonable and necessary to minimize liability in the Civil Action. (*Id.* at 23–24.)

Arrow does not present, and I have not found, cases under New York law which apply the "conducted against liability" or "inextricably intertwined" rationale in determining the scope of an insurer's duty to defend.[6] To the contrary, "New York courts have hewed to the relatively restrictive mirror-image standard." *VR Optics, LLC v. Peloton Interactive, Inc.*, No. 16-CV-6392 (JPO), 2021 WL 1198930, at *2 (S.D.N.Y. Mar. 30, 2021). Under the mirror image standard, to implicate the duty to defend, a party's affirmative claims cannot be "separable from the main action on any coherent grounds" and cannot go "'further than merely seeking the opposite of the relief demanded' of the party." *Id.* (quoting *Commercial Union Ins. Co.*, 639 F. Supp. at 1402–03). This standard has been applied

---

[6] Arrow cites *Ultra Coachbuilders, Inc. v. Gen. Sec. Ins. Co.*, 229 F. Supp. 2d 284 (S.D.N.Y. 2002), which is a New York case applying California law.

to cases where an insured brought a pre-emptive suit seeking a declaration of non-infringement against a party who had threatened—and then brought—suit for trademark infringement.  *See Smart Style Indus., Inc.*, 930 F. Supp. at 165 ("A party is 'entitled to recover costs incurred in connection with its [affirmative] claims…that were or would have been incurred in any event in connection with its defense.'")  In such a case, the duty to *defend* was found to apply even to the affirmative case, because it was a mirror image of—and effectively identical to—the suit for which the insured was entitled to defense coverage.

The claims in the ITC Action for which Arrow seeks defense coverage are not a "mirror-image" of those in the Civil Action, despite the similarities in factual allegations.  The ITC Action does not constitute an affirmative claim that mirrors Arrow's defense in the covered Civil Action.  Instead, BIC brought the ITC Action as a separate (if somewhat parallel) action, in a different forum, alleging violations of a different law.  Thus, the overlaps in factual or legal issues between the two BIC Actions are insufficient to bring defense of the ITC Action within coverage of the Policy, which only covers the Civil Action.

Finally, Arrow argues that the ITC's findings would have been issue preclusive in the Civil Action, thus necessitating NAC's coverage of the ITC Action.  (*Id.* at 23–24 (citing *B&B Hardware, Inc. v. Hargis Indus.*, 575 U.S. 138 (2015)).)  However, the court in *B&B Hardware* held that so long as the ordinary elements of issue preclusion are met, a district court in trademark infringement litigation should give preclusive effect to Trademark Trial and Appeal Board trademark registration decisions.  575 U.S. at 160.  The scope of an insurer's duty to defend was not at issue.

Ultimately, the Policy is a commercial contract that was negotiated and entered into by sophisticated parties, and the Court must interpret the parties' written agreement in a manner that reflects and respects their intentions.  The terms of the Policy limit Arrow's coverage to suits for damages for personal and advertising injuries.  Requiring NAC to defend the ITC Action would

expand the term "damages" beyond its reasonable meaning.  Moreover, New York law does not recognize application of the theories of "conducted against liability" and "inextricably intertwined" to require NAC to defend Arrow in the ITC Action.

Accordingly, I find that NAC did not have a duty to defend the ITC Action.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that Arrow's Motion for Partial Summary Judgment be GRANTED with regard to the claim that NAC's duty to defend the Civil Action arose on January 7, 2019.  I respectfully recommend that Arrow's Motion be DENIED as to its claim that NAC had a duty to defend the ITC Action.

I further respectfully recommend that NAC's Motion for Partial Summary Judgment be GRANTED and that the Court declare that NAC did not have a duty to defend the ITC Action, and, therefore, is not obligated to pay any legal fees and costs incurred by Arrow in defending the ITC Action.

To the extent that Arrow's Motion raises other issues for summary judgment, I respectfully recommend that summary judgment be denied as beyond the scope of the Court's March 13, 2020 Order, which granted leave to file a motion limited to the two issues addressed above.

Any objection to this Report and Recommendation must be filed in writing with the Clerk of Court within fourteen (14) days of service. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Failure to timely file any such objection waives the right to appeal the District Court's Order. *Caidor v. Onondaga Cty.*, 517 F.3d 601, 604 (2d Cir. 2008).

                                    **SO ORDERED:**

                                    *Peggy Kuo*
                                    PEGGY KUO
                                    United States Magistrate Judge

Dated:    January  2, 2024
          Brooklyn, New York